# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 6885 | **DATE** | 12/18/2001 |
| **CASE TITLE** | KATRIS et al vs. DOHERTY et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Pursuant to Memorandum Opinion and Order entered this day, defendants' motion to dismiss is granted. Count I is dismissed with prejudice and counts II through VII are dismissed pursuant to 28 U.S.C. §1367(c)(3) with leave to refile in state court.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | DEC 19 2001 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 12/18/2001 date mailed notice | |
| JS | courtroom deputy's initials | 01 DEC 19 AM 7:37 | JS mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PETER KATRIS, individually and in a )
derivative capacity on behalf of VIPER )
EXECUTION SYSTEMS, L.L.C. )
)
Plaintiffs, )
) No. 01 C 6885
v. )
)
STEPHEN DOHERTY, PATRICK CARROLL )
WILLIAM BEHRENS, ERNST & COMPANY, )
)       DOCKETED
Defendants. )
)       DEC 1 9 2001

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On September 5, 2001, plaintiff Peter Katris ("Katris"), individually and in a derivative capacity on behalf of Viper Executions Systems, L.L.C. ("L.L.C"), filed a seven-count complaint against defendants Ernst & Company ("Ernst"), Stephen Doherty ("Doherty"), Patrick Carroll ("Carroll"), and William Behrens ("Behrens"). Count I alleges violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) under 18 U.S.C. § 1962(c) and (d). Counts II through VII allege various state law claims against defendants, including, respectively, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, civil conspiracy, unjust enrichment, tortious interference with prospective economic advantage, and breach of contract. Defendants have now filed a joint motion to dismiss plaintiff's complaint for failure to state a claim pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(2) and 12(b)(6). After considering the matter

1

fully, this court grants defendants' motion to dismiss plaintiff's count I RICO claim pursuant to Rule 12(b)(6). This court further finds that after dismissal of the RICO claim, no independent grounds for federal subject matter jurisdiction exist for the state law claims in counts II through VII. Therefore, this court also relinquishes supplemental jurisdiction over plaintiff's state law claims and dismisses counts II through VII without prejudice with leave to refile the state law claims in state court.

## BACKGROUND[1]

### A. The Development of the Viper Software

In the mid to early 1990s, Lester Szlendak ("Szlendak"), a market maker on the Chicago Stock Exchange developed a Windows NT-based software that routed orders to multiple "give-up" brokers on multiple exchanges simultaneously through a single computer terminal. Szlendak called the software "Viper" ("Viper Software"). In addition to routing trades to multiple locations, the Viper Software allowed its user to automatically execute trades, clear them through a member clearing firm, and then create reports of executed orders. Further, the Viper Software directed the payment of order flow and managed billing. The Viper Software was a significant advance over any existing system for placing, tracking, billing, confirming, and reporting on stock orders. Moreover, it could be easily adapted to handle other types of securities, including options. At the time the Viper Software was developed, there was no other technology with its capabilities and the owner of the Viper Software could leverage this competitive advantage into substantial revenues. Szlendak used the Viper Software in his own business, executing "basket" orders of stock.

---

[1] The following relevant background facts are taken from plaintiff's complaint and are accepted as true for purposes of the motion to dismiss.

2

B. <u>Szlendak and Katris Offer the Viper Software to Ernst</u>

Because the Viper Software could be extremely valuable to a clearing firm, Szlendak sought such a buyer for the Viper Software. In the summer of 1996, Szlendak approached Katris, who at the time managed his own stock layoff business on the Chicago Stock Exchange with Ernst, a clearing firm with offices in New York and Chicago. Szlendak knew Katris from the floor of the Chicago Stock Exchange. Szlendak demonstrated the Viper Software to Katris, who was impressed with what the Viper Software could do for Katris' own stock layoff business, and for Ernst's clearing business. Katris then presented the Viper Software to Ernst, which was provided with demonstrations of the Viper Software, as well as a business plan of how it could be used to generate substantial revenues for Ernst. Defendant Behrens, who was the CEO of Ernst viewed the Viper Software in action on the floor of the Chicago Stock Exchange and expressed an interest in entering into a joint venture.

In August of 1996, Ernst began creating the documents necessary to formalize the contemplated joint venture. As part of the plan, Ernst was to obtain ownership of the Viper Software and would then be able to earn commission by licensing the Viper Software to specialists on the Chicago Stock Exchange. Katris would also be able to earn money through executing the specialist contra orders. This is the business commonly referred to as the "layoff" business which Katris performed for Ernst. Also as part of the business plan, Doherty would be responsible for maintaining and upgrading the software, providing technical support, and servicing the specialists when technical issues arose. In exchange for presenting this valuable business opportunity to Ernst, Katris expected to receive a substantial boost in his own stock layoff business and a portion of all revenues Ernst earned from the Viper Software. The remainder of 1996 was spent fine-tuning the business plan

3

and other related agreements. By early January, 1997, Ernst still had not executed any contract to purchase the Viper Software, the necessary pre-condition to any of the agreements becoming finalized. Soon thereafter, Behrens told Katris that Ernst was no longer interested in the Viper Software and would not be proceeding with the joint venture. Neither the business plan nor the other related agreements was ever executed.

C. The Formation of Viper Execution Systems, L.L.C.

Upon discovering that Ernst was not interested in proceeding with the joint venture, Katris asked whether he had Ernst's permission to buy the software himself and implement the same business model. This would enhance Katris' stock layoff business run through Ernst. Behrens told Katris that Ernst had no objection. Katris, Szlendak, Doherty, and William Hamburg ("Hamburg"), the head of the Institutional Trading for Ernst in the Chicago office, agreed to form a limited liability company ("L.L.C.") for the purpose of exploiting the capabilities of the Viper Software. Katris and Hamburg would use the Viper Software to enhance their trading businesses, as the L.L.C. would market its enhanced capabilities to brokers, traders, specialists, and portfolio managers. A portion of the individual profit realized by the increased revenues created by the use of the Viper Software would be paid to the L.L.C. Before agreeing to becoming a member of the contemplated L.L.C., Hamburg cleared his participation with Behrens, who did not object.

On February 14, 1997, Katris, Hamburg, Szlendak, and Doherty completed the formation of the L.L.C., Viper Executions Systems, L.L.C., an Illinois Limited Liability Company. Pursuant to the Operating Agreement of the L.L.C., each of the four members held a 25% participation in the L.L.C. and management was vested in Katris and Hamburg. The Operating Agreement further provided that Doherty would be the L.L.C.'s Chief Technology Officer, responsible for maintaining

4

the Viper Software and working to establish a connection between the Viper Software and the server that would provide the routing capability. Szlendak would market the Viper Software to potential clients.

D. Doherty's Failure to Establish Connection and Doherty's Work With Ernst

The first step in implementing the L.L.C.'s business plan was establishing the API network connection via the Davidge Data Systems. Doherty was responsible for establishing this connection, but after working on this for several months in early to mid 1997, Doherty failed to establish this connection and this prevented the L.L.C. from getting off the ground. .

In early 1997, Doherty, apparently unhappy with the arrangement he had made with respect to the formation of the L.L.C., had several interstate telephone conversations with Behrens and Carroll, who was in charge of options trading at Ernst's Chicago office. Some of the calls were interstate calls to Ernst's offices in New York. Through these telephone conversations, Doherty began working directly with Ernst to develop a derivative of the Viper Software, which Doherty determined would be a more lucrative venture. This was more attractive to Ernst because it did not have to share the anticipated profits with Katris and Szlendak as originally contemplated. Moreover, Ernst was negotiating with another company, Investec, for the potential sale of Ernst or the merger of the companies. Possessing a system similar to the Viper Software clear of any joint agreements would enhance Ernst's value to Investec.

On the day in early 1997 when Katris learned of Behren's decision that Ernst would not pursue the joint venture, Katris informed Carroll, and Carroll specifically asked Katris if the Viper Software could trade options. Carroll was later seen talking to Doherty about that very subject. Carroll saw the money-making capabilities of the Viper Software and subsequently had several

5

discussions with Doherty and Szlendak to discuss the routing of options orders through a Windows NT-based Internet compatible systems. Doherty and Szlendak had these conversations without the knowledge of Katris and Hamburg and they did not engage in these discussions on behalf of the L.L.C. Instead, they discussed secretly how a derivative version of the Viper Software could be created for Carroll's options business, without regard to the fact that this properly was the business of the L.L.C.

In October or November of 1997, Derek Solomon ("Solomon"), a director of The Investec Group ("Investec"), an international specialist banking group headquartered in Johannesburg, South Africa, visited Ernst's Chicago office. Investec was exploring the acquisition of Ernst as a way of expanding its presence in the United States Market. Among the people Solomon met with during his visit was Carroll, who discussed with Solomon how the Viper Software could enhance the profitability of Carroll's options trading business. During this visit to Chicago, though, Solomon told Hamburg that he was not interested in the Viper Software.

Subsequent to Solomon's visit, Carroll and Doherty corresponded with Solomon and Behrens via e-mail and telephone on several occasions all with the purpose of misappropriating the Viper Software to the detriment of the L.L.C. and Katris. In those e-mails and telephone calls, Carroll and Doherty proposed business plans based on the Viper Software model previously presented by Katris to Ernst. The only difference was, instead of using the software to route and manage stock orders, it would be used for options. Again, Doherty did not disclose this correspondence to Katris, Hamburg, or the L.L.C. Additionally, Doherty, Carroll, and Behrens did not present the Viper Software as being owned by the L.L.C. but rather presented the Viper Software as an asset of Ernst. They also positioned themselves as the prime beneficiaries should Investec consummate the

6

acquisition of Ernst and decide to employ the Viper Software to route options trades.

In the fall of 1997, Doherty flew to Ernst's main office in New York and presented a demonstration of the Viper Software to Solomon on behalf of Ernst, to help sell Solomon on the acquisition. This was done with the knowledge and encouragement of Carroll and Behrens. Investec acquired Ernst in or around January of 1998 and soon thereafter implemented the use of derivative software, called World Wide Options Web ("WWOW"), that routes options orders to multiple exchanges and give-up brokers, directs order flows, allows customization, creates reports, and manages billing in the same manner that the Viper Software performed these functions. Doherty was instrumental in developing WWOW and wrote the source and object codes for WWOW based on the codes he had written for the Viper Software.

Investec Ernst has been using WWOW since early 1999 to route options orders and Doherty, Carroll and Behrens have realized substantial financial rewards from WWOW while Katris and the L.L.C. have not received any part of the revenue Doherty helped generate through his work on WWOW.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows this court to dismiss a complaint that fails to state a claim upon which relief may be granted. In considering the merits of a motion made pursuant to Rule 12(b)(6), the well-plead allegations of the complaint must be accepted as true. Turner/Ozanne v. Hyman/Power, 111 F.3d 1312, 1319 (7th Cir. 1997). In addition, all ambiguities will be construed in favor of the plaintiff. Kelley v. Crosfield Catalysts, 135 F.3d 1202, 1205 (7th Cir. 1998). A court generally should only dismiss a complaint where it is clear that no relief could be granted with the allegations. Hishon v. King & Spaulding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232

7

(1984). Additional facts submitted outside of the pleadings will be explicitly excluded and not considered, except those documents that are attached to the motion to dismiss, are referred to in the complaint and are central to the plaintiff's claims. Levenstein v. Salafsky, 164 F.3d 345, 347 (7th Cir. 1998).

## ANALYSIS

In its proper evaluation of federal jurisdiction, this court must first consider count I of plaintiff's complaint, the RICO claim. That is the only count which provides federal jurisdiction. If count I is able to survive defendants' motion to dismiss, it would be appropriate for this court to retain supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining state claim counts. However, if count I is unable to survive the motion to dismiss, this court appropriately should relinquish supplemental jurisdiction over the state law claims in counts II through VII. No independent jurisdictional basis such as diversity of citizenship jurisdiction under 28 U.S.C. § 1332 exists.

I. RICO VIOLATION - COUNT I

Count I of plaintiff's complaint alleges two causes of action under RICO: a violation of 18 U.S.C. § 1962(c) and of § 1962(d).

A) Sufficiency of Allegations under § 1962(c)

First, Count I alleges a cause of action under RICO, 18 U.S.C. § 1962(c), which provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

8

To adequately plead a RICO claim under § 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Sedima S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985); Goren v. New Vision Int'l, Inc., 156 F.3d 721, 727 (7th Cir. 1998).

1) <u>Enterprise</u>

Defendants' first argument is that plaintiff has failed to plead sufficient facts to support the "enterprise" element of a RICO claim under § 1962(c). "[A] RICO complaint must identify the enterprise," see Stachon v. United Consumers Club, Inc., 229 F.3d 673, 675 (7th Cir. 2000), and the RICO statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The definition of "enterprise" encompasses two types of associations: (1) recognized legal entities and (2) extra-legal "associations in fact." United States v. Turkette, 452 U.S. 576, 581 (1988); Jennings v. Emry, 910 F.2d 1434, 1440 (7th Cir. 1990). Either type must have "an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." Jennings, 910 F.2d at 1440. An enterprise "must be more than a group of people who get together to commit a 'pattern of racketeering activity,'" and "[t]here must be structure and goals separate from the predicate acts themselves." Goren v. New Vision Int'l Inc., 156 F.3d 721, 732 (7th Cir. 1998).

Defendants argue that plaintiff asserts that Ernst is the RICO enterprise but does not specify how Ernst was structured, how it worked, what it did, or who controlled it. This court rejects defendants' argument and finds that plaintiff's has sufficiently alleged that Ernst is an "enterprise" under RICO. The RICO definition of "enterprise" specifically includes "corporations" or "other legal entities" and plaintiff's complaint identifies Ernst as a corporation with principal offices in

9

New York, Illinois, and elsewhere. The complaint further provides that Ernst was a clearing firm for both stocks and options, that Behren was the CEO of Ernst, Carroll was in charge of options trading at Ernst's Chicago office, and Doherty was an independent contractor for Ernst. This court believes plaintiff's complaint adequately pleads facts showing that Ernst had "structure" and was involved in more than the alleged pattern of racketeering.

2) Pattern of Racketeering Activity

The next requirement of plaintiff's § 1962(c) RICO claim is that defendants engage in a pattern of racketeering activity. Defendants argue that plaintiff has not sufficiently plead that defendants engaged in a pattern of racketeering activity. A pattern of racketeering activity requires the commission of at least two predicate acts of racketeering committed within a ten-year period. 18 U.S.C. § 1961(5). The Seventh Circuit has noted that "[g]iven RICO's generous civil awards, that amorphous definition [of pattern] has lead (not surprisingly) to widespread attempts to turn routine commercial disputes into civil RICO actions." Midwest Grinding Co. Inc. v. Spitz, 976 F.2d 1016, 1022 (7th Cir. 1992). In response, the Supreme Court has indicated that although two predicate acts of racketeering are necessary to form a pattern, two acts alone generally will not suffice. H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 237, 109 S.Ct. 2893, 2899-900 (1989). Rather, in addition to at least two predicate acts, a RICO plaintiff must show "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." Id. at 239, 109 S.Ct. at 2900. In other words, plaintiff must satisfy the so-called "continuity plus relationship" test: the predicate acts must be related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong). Id.; see also Sedima S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n.14, 105 S.Ct. 3275, 3285 n.14 (1985). This court's

analysis is limited to the continuity prong of this test because defendants do not contest that plaintiff satisfies the relationship prong.

Continuity is "both a closed- and an open-ended concept." H.J. Inc., 492 U.S. at 241, 109 S.Ct. at 2902. As its label suggests, a "closed-ended" period of racketeering activity involves a course of criminal conduct which has come to a close. To satisfy the continuity element in a closed-ended case, the plaintiff must prove a series of related predicates enduring a "substantial period of time." Id. at 242, 109 S.Ct. at 2902. The underlying rationale is that the duration and repetition of the criminal activity carries with it an implicit threat of continued criminal activity in the future. An open-ended period of racketeering, by contrast, is a course of criminal activity which lacks the duration and repetition to establish continuity. A RICO plaintiff may still satisfy the continuity requirement in that situation, however, by showing a past conduct which "by its nature projects into the future with a threat of repetition." Id. In sum, a RICO plaintiff can prevail by either (1) demonstrating closed-ended racketeering activity that existed for such an extended period of time that a threat of future harm is implicit, or (2) open-ended racketeering activity that, while short-lived, shows clear signs of threatening to continue into the future. Midwest Grinding Co. Inc. v. Spitz, 976 F.2d 1016, 1022 (7th Cir. 1992). This court does not find that a threat of continuing racketeering activity exists in this case. The Seventh Circuit has "made it clear that schemes which have a clear and terminable goal have a natural ending point" and that "[s]uch schemes therefore cannot support a finding of any specific threat of continuity . . . ." Vicom, 20 F.3d at 782. According to plaintiff, the alleged pattern or racketeering activity in this case is a "closed-ended" pattern under the RICO pattern analysis in that the predicate acts "[were] completed when the object of the pattern was achieved, namely, the illegal appropriation of [the Viper Software], its modification and

11

implementation as WWOW, the reaping of the rewards of that acquisition by the individual Defendants and the neutralization of the L.L.C. as competitor for the stock lay-off business." (Pl.'s Resp. to Mot. to Dismiss at 6). Therefore, plaintiff's contention that the alleged acts constitute a pattern of racketeering rest upon the rationale that the duration and repetition of the criminal activity carry with it an implicit threat of continued criminal activity in the future.

A closed-ended pattern of racketeering, a scheme that has ceased to exist, still exhibits the requisite continuity if the predicate acts "extend[ed] over a substantial period of time" and threaten to recur in the future. H.J., Inc. 492 U.S. at 242, 109 S.Ct. at 2902. In making that determination, this court is aided by the multifactor continuity test outlined in Morgan v. Bank of Waukegan, 804 F.2d 970, 975 (7th Cir. 1986), which survived the Supreme Court's ruling in H.J. Inc. See Olive Can Co., Inc. v. Martin, 906 F.2d 1147, 1151 n.2 (7th Cir. 1990) (stating that "our multifactored test was, in large part, confirmed by [H.J., Inc.] and is still relevant"). According to Morgan, continuity is a function of the duration of time over which the predicate acts were committed, the number and variety of predicate acts, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries. Morgan, 804 F.2d at 975. This court is to "apply these factors with an eye toward achieving a 'natural and commonsense' result, recognizing that 'Congress was concerned in RICO with long-term criminal conduct.'" Vicom, Inc. v. Harbridge Merchant Servs., Inc., 20 F.3d 771, 780 (1994) (citing H.J., Inc., 492 U.S. at 237, 109 S.Ct. at 2899).

The first factor this court will address is that of duration. Duration "is perhaps the closest thing we have to a brightline continuity test." Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1024 (7th Cir. 1992). The Supreme Court has emphasized the durational aspect of close-ended continuity, see H.J. Inc., 492 U.S. at 242, 109 S.Ct. at 2902 ("Predicate acts extending over a few weeks or

months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term conduct."), and the Seventh Circuit has recently "placed great importance on the length of time alleged predicate acts have spanned," and has labeled it "the single most important aspect of the closed-ended continuity analysis." Vicom, Inc., 20 F.3d at 780-81.

In Vicom, for instance, the Seventh Circuit found that the durational aspect of closed-ended continuity was not satisfied by racketeering predicates spanning a nine-month period. See id. at 780; see also Midwest Grinding, 976 F.2d at 1024 (same); Talbot v. Robert Matthews Distrib. Co., 961 F.2d 654, 663 (7th Cir.1992) (no pattern where single scheme occurred over period of years); J.D. Marshall Int.'l v. Reststart, Inc., 935 F.2d 815, 819-21 (7th Cir. 1991) (allegations of a single scheme involving multiple acts of mail and wire fraud over a period of thirteen months "do not paint the kind of continuing racketeering activity by [plaintiff] that is necessary to establish a RICO pattern"); U.S. Textiles, Inc. v. Anheuser-Busch Cos., 911 F.2d 1261, 1268 n. 6 (7th Cir.1990) (finding that allegations of a single scheme lasting sixteen months involving multiple predicate acts, multiple economic injuries, and a single victim insufficient to rise to the level of a pattern of racketeering activity); Hartz v. Friedman, 919 F.2d 469, 473 (7th Cir. 1990) (eighteen-month period); New Burnham Prairie Homes v. Village of Burnham, 910 F.2d 1474, 1478 (7th Cir.1990) (several years); Short v. Belleville Shoe Mfg. Co., 908 F.2d 1385, 1393 (7th Cir.1990) (four-to five-month period), cert. denied, 501 U.S. 1250, 111 S.Ct. 2887 (1991); Olive Can, 906 F.2d at 1148-49 (six-month period); Management Computer Serv., Inc. v. Hawkins, Ash, Baptie & Co., 883 F.2d 48, 50 (7th Cir.1989) (several months); Sutherland v. O'Malley, 882 F.2d 1196, 1204 (7th Cir.1989) (five-month period). In UniQuality Inc. v. Infotronx, Inc., the Seventh Circuit concluded that "one scheme that lasted at most seven to eight months" was "precisely the type of short-term, closed-

ended fraud that, subsequent to H.J., Inc., this circuit consistently has held does not constitute a pattern." 974 F.2d 918, 922 (7th Cir. 1992). In a more recent case, Corley v. Rosewood Care Center, Inc., the Seventh Circuit stated that "if the predicate acts of racketeering were addressed only to a single victim for a closed-ended period of twelve to fourteen months, we would agree that [the plaintiff] would have considerable difficulty satisfying the 'continuity' requirement." 142 F.3d 1041, 1049 (7th Cir. 1998).

In his complaint, plaintiff alleges that the RICO predicate acts began "in early 1997," when Doherty had "some" interstate telephone conversations with Carroll and Behrens as part of the scheme to develop a derivative of the Viper Software. Plaintiff further alleges that sometime in the fall of 1997, Doherty flew to Ernst's main office in New York to present a demonstration of the Viper Software to Solomon on behalf of Ernst in furtherance of defendants' scheme. Finally, in or around January 1998, plaintiff alleges that Investec acquired Ernst and soon thereafter implemented the use of software based upon the Viper Software. In plaintiff's response brief to defendants' motion to dismiss, plaintiff alleges that the defendants took the following predicate acts which form a pattern of racketeering activity: (1) multiple telephone conversations and e-mails occurring between February 14, 1997 and approximately January 1998 in which Doherty, Carroll and Behrens discussed the means by which they would steal the Viper software, modify it slightly, employ it as WWOW and enhance their respective personal positions in the process, and (2) in late 1997 or early 1998, the delivery by Doherty to Behrens in New York of the source and object code for the Viper Software that had been stolen from the L.L.C. with the full knowledge of Doherty, Carroll, and

14

Behrens.[2] While neither the complaint nor plaintiff's response brief to defendants' motion to dismiss provides this court with any precise dates as to exactly when the predicate acts took place, the predicate acts occurred over a period of approximately eleven to twelve months, at most. The Seventh Circuit "[has] not ventured as far as the Third Circuit in holding that predicate acts spanning less than one year do not as a matter of law constitute a 'substantial period of time' as required by H.J., Inc.," Vicom, 20 F.3d at 780; see also Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 611 (3d Cir. 1991 ("We hold that twelve months is not a substantial period of time."), *cert. denied*, 504 U.S. 955, 112 S.Ct. 2300. Nonetheless, in light of past Seventh Circuit analysis of various time frames with respect to the durational aspect of the continuity test, this court believes plaintiff's complaint in this case suffers from serious durational problems. The duration of the entire scheme lasted, at most, eleven to twelve months, and even this calculation is imprecise since plaintiff's complaint does not provide the exact dates of the alleged predicate acts.

While duration is the "single most important aspect of the closed-ended continuity analysis," Vicom, 20 F.3d at 781, plaintiff's allegations are deficient under the remaining Morgan factors as well. The next Morgan factor this court must consider is the number and variety of the predicate acts. Here, again plaintiff's allegations are imprecise and lacking in detail. Plaintiff alleges that defendants used interstate wires multiple times to conduct their scheme, and defendant Doherty delivered the allegedly stolen software to New York. While plaintiff claims that defendants used interstate wires multiple times to conduct the scheme, the Seventh Circuit "[does] not look favorably

---

[2]Plaintiff's complaint also alleges a commercial bribery scheme as a predicate act to establish a pattern of racketeering. However, plaintiff concedes that the commercial bribery is not a racketeering activity under 18 U.S.C. § 1961(1)(A). (Pl.'s Resp. to Mot. to Dismiss at 7 n.1).

15

on many instances of mail and wire fraud to form a pattern," Hartz v. Friedman, 919 F.2d 469, 473 (7th Cir. 1990), and "when it comes to a pattern premised on acts of mail or wire fraud, the volume of mailings is not dispositive." U.S. Textiles, Inc. v. Anheuser-Busch Cos., 911 F.2d 1261, 1266 (7th Cir. 1990). The only other predicate act plaintiff alleges is the delivery of the software to New York. This court does not believe plaintiff's allegations of several instances of very similar mail and wire fraud, and one act of delivering the software, constitute "a number and variety of predicate acts" as that phase is understood in the caselaw.

The next Morgan factor is the number of victims involved. Plaintiff submits that the L.L.C. is the principal, but not sole, victim of the alleged illegal appropriation of the Viper Software and its modification and implementation as WWOW in that the L.L.C. was deprived of the faithful service of Doherty, deprived of its property, and placed in a competitive disadvantage from which it never recovered. (Complaint at ¶¶ 76, 80.) Plaintiff further contends that he was a victim of the scheme because his stock lay-off business, which was separate from the activities of the L.L.C., was injured. (Complaint at ¶¶ 24, 26, 27, 30, 38, 76, 80.) Finally, plaintiff argues that Investec was a victim of the scheme because it was induced to buy Ernst believing that Ernst had the rights and interests in the derivative of the Viper Software. (Complaint at ¶¶ 47, 56, 57.) Even were this court to accept plaintiff's contentions that the L.L.C. was not the sole victim of defendants' alleged scheme, first, this court does not believe that three victims constitutes a "large number of victims" and second, alleging three victims, standing alone, cannot support a finding that continuity exists in light of the deficiencies in the other Morgan factors.

Another factor this court must look to under Morgan is the existence of separate schemes. In his complaint, plaintiff does not attempt to allege more than one scheme. Plaintiff alleges only

16

the scheme to misappropriate the Viper Software and to modify and implement it as WWOW. The final Morgan factor is the occurrence of distinct injuries. Plaintiff maintains that the L.L.C. was injured in that it was deprived of its property, Katris was injured because his stock layoff business never experienced the anticipated growth with the Viper Software, and finally, that Investec was injured because it bought Ernst believing Ernst had the rights and interests in the Viper Software or the derivative of Viper, when in fact, Ernst did not have the rights. Taking together the predicate acts alleged, and this court's Morgan multifactor analysis, this court concludes that the plaintiff's allegations cannot support a finding of closed-ended continuity. The closed-ended RICO scheme plaintiff alleges has none of the trappings of a long-term criminal operation that carries with it a threat to society. This court believes that it is, in short, a misappropriation of a business opportunity case that belongs in state court.

B) Sufficiency of Allegations under § 1962(d)

Count I of the complaint also alleges defendants violated § 1962(d) of RICO, which states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) or this section." 18 U.S.C. § 1962(d). The widely accepted principle in the common law of civil conspiracy is that "a plaintiff could bring suit for civil conspiracy only if he had been injured by an act that was itself tortious." See Beck v. Prupis, 529 U.S. 494, 501, 120 S.Ct. 1608, 1614 (2000) (citing Restatement (Second) of Torts § 876, Comment v (1977) ("The mere common plan, design or even express agreement is not enough for liability in itself, and there must be acts of a tortious character in carrying it into execution."). Consistent with this principle, "it was sometimes said that a conspiracy claim was not an independent cause of action, but was only the mechanism for subjected co-conspirators to liability when one of their member committed a tortious act." See

17

id. at 503, 120 S.Ct. at 1615 (citing Royster v. Baker, 365 S.W.2d 496, 499, 500 (Mo. 1963). In Beck v. Prupis, the Supreme Court held that the common law principle that a civil conspiracy plaintiff must first sufficiently claim injury from an act of a tortious character "was so widely accepted at the time of RICO's adoption as to be incorporated in the common understanding of 'civil conspiracy.'" 529 U.S. at 504, 120 S.Ct. at 1615. Therefore, as at common law, "a civil conspiracy plaintiff cannot bring suit under RICO based on injury caused by *any* act in furtherance of a conspiracy that might have caused the plaintiff injury. Rather, consistency with the common law requires that a RICO conspiracy plaintiff allege injury from an act that is analogous to an 'ac[t] of a tortious character,' see 4 Restatement (Second) of Torts § 876, Comment b, meaning an act that is independently wrongful under RICO." Id. at 505, 120 S.Ct. at 1616 (emphasis in original). In order to have standing in this civil RICO suit, plaintiff must allege that he sustained an injury to his business or property that was proximately caused by some act of the defendants that was an "act of racketeering or otherwise unlawful under [RICO]." Id. at 507, 120 S.Ct. at 1617.

As detailed in the preceding section, this court finds that even accepting all plaintiff's allegations as true, plaintiff's complaint still does not state a claim for violation of § 1962(c) because taken together, the alleged predicate acts of mail and wire fraud, and delivery of the Viper Software to New York, in furtherance of a single scheme and spanning a period of less than one year, do not establish a pattern of racketeering activity, which is an essential element to a substantive claim for a RICO violation under § 1962(c). Therefore, because plaintiff fails to allege any acts that are independently wrongful under RICO, any injury caused by such acts are not sufficient to give rise to plaintiff's cause of action under § 1962(d). Accordingly, this court finds plaintiff fails to state a RICO conspiracy claim under § 1962(d).

## II. REMAINING STATE CLAIMS - COUNTS II - VII

Counts II through VII of plaintiff's complaint allege various violations of state law. In view of this court's finding that plaintiff fails to allege a pattern of racketeering activity as required to state a § 1962(c) RICO claim and that plaintiff fails to state an actionable RICO conspiracy claim under § 1962(d), this court dismisses count I, and accordingly dismisses the state law claims set forth in counts II through VII of the complaint pursuant to 28 U.S.C. § 1367(c)(3) for lack of federal subject matter jurisdiction.

## CONCLUSION

For all the reasons stated above, defendants' motion to dismiss is GRANTED. Count I is dismissed with prejudice and counts II through VII are dismissed pursuant to 28 U.S.C. § 1367(c)(3), with leave to refile in state court.

ENTER:

*James F. Holderman*
JAMES F. HOLDERMAN
United States District Judge

DATE: December 18, 2001